# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| J.N., as motion and next friend of<br>M.N., a minor, | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Civil Action Number |
| vs. | ) | **2:19-cv-00047-AKK** |
| | ) | |
| JEFFERSON COUNTY BOARD | ) | |
| OF EDUCATION, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This cross appeal of an administrative due process hearing is before the court

on two motions:  J.N.'s motion for summary judgment, doc. 14, and the Jefferson

County Board of Education's motion for summary judgment and judgment on the

administrative record, doc. 13.  J.N., as mother and next friend of M.N., a minor,

filed an administrative due process complaint against the Board pursuant to 20

U.S.C. §§ 1415(b)(6)(A) and 1415(f)(1)(A), alleging that the Board violated the

Individuals with Disabilities Education Act ("IDEA") by failing to provide M.N. a

free appropriate public education ("FAPE").  Doc. 12-6 at 3-9.  After a hearing

officer dismissed the complaint as premature, doc. 12-1 at 3-7, J.N. appealed, and

Chief Magistrate Judge John E. Ott vacated the hearing officer's decision and

remanded with instructions for the officer to conduct an impartial due process

hearing "to determine whether the Board violated its 'child find' obligations, and if so, the appropriate amount and type of compensatory education or other relief necessary, if any," doc. 22 at 13-14 in Case No. 2:17-cv-00448-JEO.

On remand, the hearing officer found that the Board violated its child-find obligations by "overlook[ing] clear signs of disability," but did not award any compensatory education or other relief because she found that J.N. did not meet her burden of showing what relief is necessary to make M.N. whole for the violation. Doc. 12-41 at 32-34. J.N. appeals the portion of the hearing officer's decision not to award relief, and she asks the court to affirm the finding that the Board violated its child-find obligation, and to award M.N. appropriate relief, including compensatory education, or, alternatively, to remand the case with instruction for the hearing officer to provide M.N. with appropriate compensatory education and other relief. Docs. 1; 14. For its part, the Board appeals the portion of the decision finding that it violated its child-find obligations, and it asks the court to affirm the hearing officer's decision denying relief. Docs. 4; 13. After careful review of the parties' briefs and the administrative record, the court finds that the hearing officer's decision is due to be affirmed, and judgment is due in the Board's favor.

## I.      STANDARD OF REVIEW

"[A]ny party aggrieved by the findings and decision made" by a hearing officer on a due process complaint under the IDEA "shall have the right to bring a

civil action with respect to the complaint presented . . . in a district court of the United States, without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). In such cases, "the usual [Rule] 56 summary judgment principles do not apply . . . because no IDEA jury trial right exists." *Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1313–14 (11th Cir. 2003). Thus, a district court may "base[] its decision on the preponderance of the evidence even when facts are in dispute." 20 U.S.C. § 1415(i)(2)(C)(iii). And, the district court has broad discretion "to grant such relief as the court determines is appropriate." *Id.*

District courts are permitted to make findings of fact in IDEA cases, and "judgment on the record" is appropriate "even when facts are in dispute," as long as judges "accord due weight to administrative findings" and base their own findings on a preponderance of the evidence. *Loren F.*, 249 F.3d at 1313-14. Although courts "must be careful not to substitute [their] judgment for that of the state educational authorities, . . . the extent of the deference to be given to the administrative decision is left to the sound discretion of the district court, which must consider the administrative findings but is free to accept or reject them." *Walker Cty. Sch. Dist. v. Bennett ex rel. Bennett*, 203 F.3d 1293, 1297–98 (11th Cir. 2000). But, if the court rejects the administrative findings, "it is 'obliged to explain why.'" *R.L. v. Miami-Dade Cty. Sch. Bd.*, 757 F.3d 1173, 1178 (11th Cir. 2014) (quoting *Walker Cty.*, 203 F.3d at 1314, n.5).

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A.    M.N.'s relevant academic history

At the time J.N. filed her due process complaint on behalf of M.N. in December 2016, M.N. was a fourteen-year-old student in eighth grade at Hueytown Middle School, a public school operated by the Board.  Doc. 12-6 at 3.  When M.N. enrolled in the school at the beginning of sixth grade, J.N. completed medical records indicating that M.N. and her twin sister suffered from attention deficit hyperactivity disorder ("ADHD").[1]  *See* doc. 14-14 at 4-5.  In March of M.N.'s sixth-grade year, J.N. informed the school again that M.N. and her sister had ADHD because she wanted to be sure the school knew of their condition.  Doc. 14-13 at 6.

As a result of a behavioral infraction in sixth grade, the school suspended M.N. for three days and sent her to an alternative school for fifteen days.  Docs. 12-14 at 17; 14-11 at 6; 14-13 at 8; 14-14 at 6.  During discussions regarding M.N.'s infraction, J.N. informed the assistant principal that M.N. had ADHD, which purportedly caused her behavioral challenges.  Docs. 14-13 at 8; 14-15 at 1-2.  Although M.N. had behavioral issues, she generally did well academically that school year and earned A's and B's in most of her classes, though she earned C's in

---

[1] J.N. also filed a due process complaint alleging the Board violated child find with respect to M.N.'s twin sister.  *See* doc. 12-24.  Because of the similarity in the issues presented in the two complaints, the administrative record from M.N.'s sister's due process hearing is part of the record in this case.  *See* doc. 12-41 at 27, n.4 and 5.

her reading and math classes, and her results from the ACT Aspire test in sixth grade indicated that she needed support in reading. Docs. 12-10 at 7-28; 14-14 at 2. Accordingly, J.N. testified that sixth grade "wasn't so bad" for M.N., but that M.N. experienced a clear decline in the seventh and eighth grades. Docs. 14-13 at 8.

Indeed, the record reflects that M.N. continued to have behavioral issues in the seventh grade, and she received detentions and suspensions on several occasions. Docs. 12-14 at 18-23; 14-14 at 1; 14-15 at 1-2. In a meeting with Christopher Anders, the school's principal, to address one of M.N.'s behavioral incidents, J.N. informed Anders that M.N.'s ADHD may be causing her behavioral issues. Doc. 14-15 at 1. In addition, at the beginning of the school year, M.N. had severe behavioral issues in her English enrichment class, but J.N. and Christine Horton, M.N.'s English teacher, attributed these issues to M.N. being in the same class as her twin sister. Docs. 14-13 at 11-12; 14-15 at 1. And, M.N.'s behavior improved when her counselor moved her to a different class. Docs. 14-13 at 11-12; 14-15 at 1. M.N. also had academic problems in seventh grade, including in her math and English classes, and an elective music class. Doc. 14-13 at 12. In particular, M.N. earned a D for each grading period in math, and D's for one grading period in her English, geography, and citizenship classes. Docs. 12-9 at 24-40; 12-10 at 1-6. Moreover, M.N.'s scores from the ACT Aspire test indicate that she needed support in reading, science, and math. Doc. 14-14 at 2. Despite M.N.'s poor grades and test

results, Anders testified that her seventh grade math teacher, Sarah Ellis, informed him that she had provided one-on-one help for M.N. and that M.N. demonstrated that "she knew the concepts that they were covering" during those help sessions. Doc. 12-7 at 58.

M.N.'s behavioral and academic issues continued into eighth grade, and she especially struggled and acted out in her math class. Docs. 14-15 at 2, 6. According to Kimberly LaFoy, her math teacher, M.N. scored poorly on tests, did not appear to comprehend the subject, and lagged behind her peers. Docs. 14-13 at 8; 14-15 at 6. Thus, in late September, LaFoy recommended M.N. for a "pre-referral," or problem solving team ("PST") intervention, whereby LaFoy and M.N.'s other teachers would provide M.N. additional help and support, and monitor M.N.'s progress before deciding whether to refer her for a formal special education evaluation. Doc. 12-7 at 33-34, 60. The school officially placed M.N. in the PST program at the end of the first quarter of her eighth grade year. *See* doc. 14-15 at 14; doc. 12-7 at 33-34, 60. In addition, LaFoy called J.N. to discuss M.N's performance and behavior issues, and J.N. told LaFoy that M.N.'s ADHD likely caused her behavior issues and lack of focus. Docs. 14-13 at 8; 14-15 at 2-3, 8. When J.N. inquired if M.N. had an individualized education plan, or IEP, LaFoy informed her that M.N. did not, but that LaFoy had begun the PST process in order for M.N. to receive extra help. Docs. 14-13 at 8; 14-15 at 3, 8-9. After M.N.'s academic performance failed to improve

with the PST intervention, LaFoy referred M.N. for a special education evaluation in early December 2016. Docs. 12-33 at 23; 14-11 at 8; 14-15 at 4, 9; 14-16 at 2.

Subsequently, the Board evaluated M.N. and determined that she was eligible for special education services based on a "Specific Learning Disability-Math and Other Health Impairment-Attention Deficit Hyperactivity Disorder." Docs. 12-16 at 16; 14-11 at 9. Based on the evaluation, M.N. "scored in the very low range in her overall intellectual ability," and also scored in the very low range on the visual spatial and fluid reasoning indices, which measure M.N.'s ability "to evaluate visual details and understand whole-part relationships" and M.N.'s "logical thinking skills and [] ability to use reasoning to apply rules." Docs. 12-16 at 20-21; 14-14 at 2. In addition, the teachers who completed the behavior evaluations indicated that M.N. had significant behavioral issues consistent with a diagnosis of ADHD. Doc. 14-14 at 3. Thus, the Board implemented an IEP for M.N. in March 2017, and M.N. continues to receive special education services pursuant to her IEP. *See* docs. 12-22 at 22-23; 14-15 at 3; .[2]

B.    **The underlying due process complaint and procedural history**

Unsatisfied with the school's approach to M.N.'s academic and behavioral issues, J.N. filed an administrative complaint in December 2016, alleging that the Board knew or should have known that M.N. needed special education services,

---

[2] J.N. does not challenge the adequacy of the evaluation or the IEP the school implemented following the evaluation. *See* docs. 1; 14.

failed to identify and evaluate M.N. in violation of its "child find" obligations, and failed to develop and implement an IEP and provide a FAPE for M.N. Doc. 12-6 at 3-9. The hearing officer initially dismissed J.N.'s complaint. Doc. 12-41 at 22. J.N. appealed, and Judge Ott vacated the decision and remanded the case for an impartial due process hearing to determine "whether the Board violated its 'child find' obligations and, if so, the appropriate amount and type of compensatory education or other relief, if any." Doc. 22 in Case No. 2:17-cv-00448-JEO at 13. Thereafter, the hearing officer held the due process hearing, doc. 12-7, and subsequently issued a decision finding that the Board violated its child-find obligation, but declining to award M.N. any compensatory education, or order any other relief for the violation, doc. 12-41 at 22-35. J.N. and the Board both appeal from the portion of the decision that is adverse to her or it, and ask the court to affirm the favorable portion. Docs. 1 and 4.

## III.   ANALYSIS

The IDEA offers federal funds to states to assist in educating children with disabilities. *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017). "In exchange for the funds, a State pledges to comply with a number of statutory conditions," which include providing a FAPE to all eligible children with disabilities. *Id.* A FAPE must include "specially designed instruction . . . to meet the unique needs of a child with a disability . . . ." 20 U.S.C. at

§§ 1401(9), (29).  To that end, schools must devise an IEP to address the educational needs of a child with a disability.  *See id.* at § 1401(9)(D).

Relevant here, a covered state must also comply with the IDEA's child-find obligation, which requires its schools to "'identif[y], locat[e], and evaluat[e]' '[a]ll children with disabilities residing in the State' to ensure that they receive needed special-education services."  *Forest Grove School Dist. v. T.A.*, 557 U.S. 230, 245 (2009) (quoting 20 U.S.C. § 1412(a)(3)(A), alteration in original).  To meet this obligation, schools must assess a child "in all areas of suspected disability" to determine whether the child is eligible to receive an IEP.  20 U.S.C. § 1414; 34 C.F.R. § 300.304(c)(4).  The child-find obligation extends to all "[c]hildren who are suspected of being a child with a disability . . . and in need of special education, even though they are advancing from grade to grade . . . ."  34 C.F.R. § 300.111(c)(1). However, the child-find obligation "does not extend to testing every student who is not successful when factors other than a disability would also explain the failure to progress; evaluations are only required when the evidence is sufficient to cause a school system to have a reasonable belief that such an evaluation is necessary." *Jefferson Cty. Bd. of Educ. v. Lolita S.*, 977 F. Supp. 2d 1091, 1124 (N.D. Ala. 2013), *aff'd,* 581 F. App'x 760 (11th Cir. 2014); *see also D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 252 (3rd Cir. 2012) (finding that "schools need not rush to judgment or immediately evaluate every student exhibiting below-average capabilities").

The party seeking relief bears the burden of proving a violation of the IDEA. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005); *Devine v. Indian River Cty. Sch. Bd.*, 249 F.3d 1289, 1292 (11th Cir. 2001). J.N. may satisfy that burden by showing that the Board violated its child-find obligations by "overlook[ing] clear signs of disability" or "negligently fail[ing] to order testing." *Durbrow v. Cobb Cty. Sch. Dist.*, 887 F.3d 1182, 1196 (11th Cir. 2018) (citing *Bd. of Educ. of Fayette Cty., Ky. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007)). In addition, as the party seeking relief, J.N. bears the burden with respect to her request for relief. Ala. Admin. Code § 290-8-9.08(9)(c). *See also Schaffer*, 546 U.S. at 62.

## A. Whether the hearing officer properly found that the Board violated its child find obligations under the IDEA

Turning to the specifics here, the hearing officer found that the Board violated its child-find obligations because it "overlooked clear signs of disability." Doc. 12-41 at 33. In particular, she found that "School District personnel should have had a reasonable suspicion that [M.N.] had a disability and might be in need of special education services and thus violated their duty to identify her as such by overlooking clear signs of disability." *Id.* The Board challenges this finding, arguing in part that the hearing officer improperly conflated "'a reasonable suspicion that [M.N.] had a disability and might be in need of special education services' with the concept of 'overlooking clear signs of a disability.'" Doc. 13 at 20 (citing doc. 12-41 at 32). This argument is unavailing in light of the regulations implementing the child-find

requirement, which provide that "[c]hild find also must include [] [c]hildren who are suspected of being a child with a disability . . . ." 34 C.F.R. § 300.111(c)(1). Thus, as this court has previously found, the child-find duty requires schools to evaluate a student in all areas of suspected disability "when the evidence is sufficient to cause a school system to have reasonable belief that such an evaluation is necessary." *Lolita S.*, 977 F. Supp. 2d at 1124.

The Board further contends that J.N. cannot establish a child-find violation because the evidence shows that it reasonably attributed M.N.'s academic and behavioral issues initially to the increasing demands of the seventh and eighth grade curriculums, and it did not overlook M.N.'s issues because teachers provided her with extra help. *See* doc. 13 at 20-27. While the Board is correct that "schools are encouraged to use 'measures besides special education to assist struggling students," *D.J.D. v. Madison City Bd. of Edu.*, Case No. 5:17-cv-00096-AKK, 2018 WL 4283058 at *4 (N.D. Ala. Sept. 7, 2018) (quoting *Durbrow*, 887 F.3d at 1196), this case is distinguishable from *D.J.D.* and *Durbrow*, the primary cases the Board cites to support its contention. First, unlike M.N., the student in *D.J.D.* met expectations in all academic areas in spite of his behavioral issues. *Id.* at *4. Similarly, in *Durbrow*, the student met or exceeded academic expectations before and during his first three years of high school and earned high scores on standardized tests, and none of his teachers indicated that he might need special education services. 887

F.3d at 1194. Moreover, when the student's grades declined during the first semester of his senior year, the school district evaluated him for special education eligibility the following semester. *Id.* at 1196. Thus, the Eleventh Circuit found that "it cannot be said that the [school district] 'overlooked clear signs of disability' or 'negligently failed to order testing,'" and, alternatively, that the school district "fulfilled its child-find duty by evaluating [the student] within a reasonable time." *Id.* at 1196-97 (citations and alterations omitted).

In contrast, M.N. had a history of low scores on standardized tests, and she struggled academically for more than a year, especially in math, before a teacher referred her for formal academic support or evaluation. The Board attempts to justify the delay by contending that M.N. "showed control of the concepts" in her seventh grade math class when her teacher helped her one-on-one. Doc. 13 at 12-13, 23. But, that contention is belied by M.N.'s grades, which reflect that she earned D's in math for each grading period that year, and M.N.'s ACT Aspire results, which indicate that she needed additional support in math. Docs. 12-14 at 11; 14-14 at 2. Similarly, M.N. earned D's in math for each grading period in eighth grade, even though her teacher routinely allowed her to retake tests and provided her with significant additional help. Doc. 12-7 at 27, 31-32. Although the teacher referred M.N. to the PST program after the first quarter of her eighth grade year and referred her for a special education evaluation when PST intervention failed, nothing in the

record suggests that the Board took any formal steps to provide M.N. with additional support in seventh grade or at the start of eighth grade, such as implementing the PST program, despite M.N.'s demonstrated lack of progress in her seventh grade math class. And, as the hearing officer deciding M.N.'s sister's due process complaint aptly stated, "[t]o say a student is a 'solid D' and therefore relegate []her to that status for []her school career is not what the child find principle entails." Doc. 12-24 at 18 (citing 20 U.S.C. § 1400(c)(1)-(2)).

Based on this record, the hearing officer found that "school personnel may not have attributed [M.N.'s] behavior to typical middle school problems had they taken into account [M.N.'s] medical diagnosis" of ADHD. Doc. 14-11 at 11. Indeed, throughout M.N.'s middle school years, Board personnel had notice of M.N.'s ADHD diagnosis, but there is no evidence indicating that any teacher or school administrator considered whether, in light of that diagnosis, M.N.'s academic and behavioral issues could have been attributed to a disability rather than typical middle school problems. Thus, giving due weight to the hearing officer's decision, and based on a preponderance of the evidence, including M.N.'s ADHD diagnosis, declining grades in her seventh grade year, poor results on standardized tests, and behavioral issues, the court finds that the Board violated its child-find obligation by overlooking clear signs of disability by the end of M.N.'s seventh grade year.

**B.** **Whether the hearing officer properly withheld an award compensatory education or other relief**

Although the hearing officer found that the Board violated its child-find obligations, she did not award M.N. any compensatory education or other relief. Doc. 14-11 at 12-13. J.N. contends that the hearing officer erred by withholding relief and argues, in part, that the court should order that the Board train its personnel to identify students who need special education services. Doc. 14 at 26. But, J.N. did not seek relief relating to training the Board's teachers on child find in her due process complaint, doc. 12-6 at 8-9,[3] and the party requesting relief "may not raise issues at the due process hearing that were not raised in the written request for hearing," Ala. Admin. Code § 290-8-9-08(9)(c)(6). Indeed, at the hearing, J.N. did not produce any evidence of systemic violations of the Board's child-find obligations, or other evidence to suggest a need for district-wide training for teachers, *see* doc. 12-7, and she has not presented such evidence in this case, *see* doc. 14. Consequently, J.N. has not shown that she is entitled to an order requiring training for Board personnel.

Next, J.N. argues the hearing officer should have afforded M.N. relief in the form of compensatory education, doc. 14 at 24-27, and she seeks such an award for M.N. for the two years prior to the filing of the complaint, doc. 12-6 at 9.

---

[3] In post-hearing briefing, J.N. asked the hearing officer to "order that all Jefferson County teachers receive formal training concerning the school district's child find obligations under the IDEA," but the hearing officer declined to award such relief. Doc. 12-41 at 34, n.12.

Compensatory education is an equitable remedy that a hearing officer or court may award when "appropriate" for violations of the IDEA. *Parents of Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1497 (9th Cir. 1994). *See also* 34 C.F.R. § 300.516(c)(3). "Compensatory education provides services 'prospectively to compensate for a past deficient program.'" *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1290 (11th Cir. 2008) (quoting *G. ex rel. RG v. Fort Bragg Dependent Sch.*, 343 F.3d 295, 308 (4th Cir. 2003)). In that respect, compensatory education "is replacement of educational services the child should have received in the first place." *Reid ex Rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005). In this Circuit, compensatory education is "'appropriate relief where responsible authorities have failed to provide a handicapped student with an appropriate education as required by the [IDEA].'" *Draper*, 518 F.3d at 1290 (quoting *Todd D. ex rel. Robert D. v. Andrews*, 933 F.2d 1576, 1584 (11th Cir. 1991).

As noted, despite the Board's violation of child-find, the hearing officer determined that no compensatory education is warranted in this case. Doc. 12-41 at 35. The Board asks the court to affirm that decision, contending that the hearing officer did not abuse her discretion[4] because the officer "'may [] choose to withhold

---

[4] The Board contends that the Court should review the hearing officer's decision not to award compensatory education for an abuse of discretion. Doc. 13 at 17-18. But, the cases the Board cites to support that contention hold that a circuit court reviews a district court's decision to grant or withhold relief under the IDEA for an abuse of discretion, *see R.L. v. Miami-Dade Cty. Sch. Bd.*, 757 F.3d 1173, 1192 (11th Cir. 2014); *Draper*, 518 F.3d at 1290, and the circuit based that holding on the IDEA provision stating that in an administrative appeal before a district court, "the

relief despite a demonstrated . . . statutory violation if [she] has a valid basis in equity for doing so.'" Doc. 13 at 17 (quoting *Garcia v. Board of Education of Albuquerque Public Schools*, 520 F.3d 1116, 1129 (10th Cir. 2008)). This contention misses the mark, however, because neither the hearing officer nor the Board has shown any basis in equity to support the decision to withhold compensatory relief to M.N. *See* docs. 13 at 17-19; 14-11 at 22-35. By contrast, in *Garcia*, the case the Board cites, the district court determined the plaintiff was not entitled to an award of compensatory education because she had rejected special education services in the past, refused to attend school, and special education services were available to her if and when she decided to return to school. 520 F.3d at 1130-31. The Tenth Circuit affirmed, finding that the district court's reasons for declining to award compensatory education "accord with the relevant purposes of IDEA and are supported by the undisputed facts in the record . . . ." *Id.* at 1130. The record in this case is devoid of such evidence providing an equitable basis to withhold relief. Thus, the Board's reliance on *Garcia* is misplaced.

The Board argues alternatively that the court should affirm the decision withholding relief because M.N. did not sustain her burden of proof on the issue of

<hr>

court . . . shall grant such relief as the court determines is appropriate," 20 U.S.C. § 1415(i)(2)(C)(iii). *See also Garcia v. Board of Education of Albuquerque Public Schools*, 520 F.3d 1116, 1129 (10th Cir. 2008). Consequently, the Board has not shown that an abuse of discretion standard applies to the hearing officer's decision to withhold relief.

compensatory education.  Doc. 13 at 18-19.  In that respect, the Board first contends that the hearing officer properly withheld relief because the record lacks any evidence regarding how compensatory education was appropriate at the time of the hearing and how it would benefit M.N. now that she has matriculated to high school. *Id.*  The Board's contention on that point is unavailing because the purpose of compensatory education is to remedy a school's past denial of a FAPE to a disabled child, not to address the child's current educational need.  *See Draper*, 518 F.3d at 1290.  Or, as the hearing officer put it, "[t]he purpose of compensatory education is to make [M.N.] whole from the time of wrong doing up to the date of the filing of the complaint, not to provide extra help."  Doc. 12-41 at 34-35.

Although the hearing officer correctly recognized that the purpose of compensatory education is to remedy a past violation of the IDEA, she did not consider whether the Board's violation of child find deprived M.N. of a FAPE, and, if so, whether compensatory education is appropriate to remedy the denial.  Doc. 12-41 at 34-35.  Instead, the hearing officer devoted less than a page of her decision to the issue of compensatory education before determining that relief is not warranted because the only evidence regarding the need for such relief was J.N.'s testimony that M.N. "would benefit from additional or compensatory education in the area of reading and math."  *Id.* at 34.  In doing so, the hearing officer never addressed the evidence of M.N.'s declining grades, behavioral issues, and poor test results in

seventh and eighth grades, and how this evidence does not support a finding that compensatory education is appropriate. And, the hearing officer did not cite any authority to support her decision not to award M.N. any compensatory education. Doc. 12-41 at 34-35. "Although the Court must give 'due weight' to the administrative proceedings [], a hearing officer's decision 'without reasoned and specific findings deserves little deference.'" *N.G. v. D.C.*, 556 F. Supp. 2d 11, 18 (D.D.C. 2008) (quotations omitted). Thus, the court gives little deference to the hearing officer's decision to withhold relief.

Nevertheless, the Board and hearing officer are correct that J.N. "has the burden of proof with respect to . . . [the] request for relief." Ala. Admin. Code § 290-8.08(9)(c). *See also Schaffer*, 546 U.S. at 62. Therefore, the court turns to whether J.N. has established that an award of compensatory education is appropriate in this case. According to J.N., the record shows M.N. needs compensatory education in math and English "in the form of tutoring or private tutoring to be paid by the school" to remedy the Board's failure to provide her with special education services during her sixth and seventh grade years. *See* docs. 14 at 25; 19 at 15. However, M.N. generally earned good or average grades in sixth grade, and J.N. admitted at the hearing that, in spite of M.N.'s behavioral issues, her sixth-grade year was not so bad. Doc. 14-13 at 8. Thus, J.N. has not shown that the Board denied M.N. a FAPE

at any time in sixth grade, and M.N. is not entitled to any compensatory education for that year.

With respect to seventh grade, M.N.'s grades declined during the year, especially in math, in which she earned a D for each grading period. Doc. 12-14 at 11. But, neither the hearing officer nor J.N. identified exactly when the Board violated its child find obligations based on M.N.'s declining grades in seventh grade, *see* docs. 12-41 at 22-35; 14, and J.N. does not criticize that aspect of the hearing officer's decision, *see* docs. 14; 19; 20. In addition, J.N. did not testify at the hearing regarding when she believes Board personnel should have referred M.N. for formal PST intervention or special education evaluation, nor did she elicit such testimony from M.N.'s teachers. *See* doc. 12-7. J.N. also did not cite any independent evidence regarding if and when a teacher should have referred M.N. for formal intervention or evaluation. *See* docs. 14; 19; 20. Moreover, J.N. did not dispute the evidence that M.N.'s seventh grade math teacher provided M.N. with informal intervention in the form of one-on-one help, and that the teacher believed M.N. showed understanding of the concepts taught in class in those help sessions. *See* doc. 12-7 at 58; 14; 19; 20. And, M.N.'s grades in English reveal that she earned a B in the first quarter and brought her grade up to a C for the third and fourth quarters after earning a D in the second quarter. Docs. 12-9 at 24-40; 12-10 at 1-6. On this record, J.N. has not shown that the Board's child-find violation resulted in a denial of a

FAPE to M.N. in the seventh grade, or that she should be awarded compensatory education for math and English for that school year.

Next, M.N. continued to earn D's in math in eighth grade, but her teacher implemented informal interventions to help M.N. early in the year, such as small group instruction and allowing M.N. to retake tests, and she referred M.N. for formal PST intervention at the end of the first quarter. Doc. 12-7 at 27-34. J.N. has not cited any evidence to suggest that the interventions the math teacher provided M.N. were inappropriate or substantively different than interventions she should have provided pursuant to an IEP. *See* docs. 14; 19; 20. Additionally, J.N. did not cite any evidence to suggest that M.N.'s English teacher and other teachers did not provide M.N. with appropriate help during the PST intervention. *See id.* Thus, even though the Board violated its child-find obligation by failing to refer M.N. for special education evaluation prior to December 2016, J.N. has not shown by a preponderance of the evidence that the violation resulted in a denial of a FAPE to M.N., and she has not established that M.N. should receive compensatory education for the violation.

To summarize, the court concludes that the hearing officer erred by determining that an award of compensatory education is not warranted without considering whether the Board denied M.N. a FAPE, but the error is harmless because J.N. did not meet her burden of showing that the Board deprived M.N. of a

FAPE due to its child-find violation. Accordingly, the hearing officer's decision is due to be affirmed.

## C. Whether J.N. is entitled to an award of attorney's fees

Finally, J.N. asks the court to award her attorney's fees. Doc. 14 at 27-28. The IDEA provides that "the court, in its discretion, may award reasonable attorneys' fees as part of the costs [] to a prevailing party who is the parent of a child with a disability . . . ." 20 U.S.C. § 1415(i)(2)(C). For purposes of awarding attorney's fees, a prevailing party is a party who "'succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit.'" *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (quotation omitted). Put differently, "'[o]nly a party who obtains a judgment on the merits or a similar court-ordered change in the parties' legal relationship, such as a consent decree, may be considered a prevailing party for purposes of a fee award.'" *Robert K. v. Cobb Cty. Sch. Dist.*, 279 F. App'x 798, 801 (11th Cir. 2008) (quoting *Loggerhead Turtle v. County Council*, 307 F.3d 1318, 1323-24 (11th Cir. 2002). *See also Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 604 (2001).

J.N. contends that she is the prevailing party because "[t]hrough the filing of the due process complaint and the efforts of [her] attorneys, [M.N.] is eligible for special education and related services and has an IEP." Doc. 14 at 28. However, the record shows that the school referred M.N. for a special education evaluation

before J.N. filed her due process complaint. Doc. 12-6 at 3-9; 12-7 at 29, 36-37; 12-33 at 23; 12-34 at 4. Thus, the filing of the due process complaint did not lead to the determination that M.N. is eligible for services under the IDEA, and J.N. cannot rely on the determination to support her claim for attorney's fees.

Next, J.N. asserts she is the prevailing party based on the hearing officer's conclusion that the Board violated its child-find obligations. Doc. 14 at 28. But, that conclusion did not change the parties' legal relationship, and it did not result in an award of compensatory education, which is the relief J.N. sought in this action. *See* docs. 12-6 at 3-9; 12-41 at 22-35. Accordingly, the court finds that J.N. is not the prevailing party for purposes of awarding attorney's fees.

## IV. CONCLUSION

For the reasons explained above, the hearing officer's decision is due to be affirmed, and J.N.'s and the Board's motions for summary judgment, docs. 13 and 14, are each due to be granted in part and denied in part. A separate order will be entered.

**DONE** the 6th day of November, 2019.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE